**Marlin Deandre HOUSE, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 14–07–00306–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 24, 2008.

Danny K. Easterling, Houston, TX, for Appellant.

Kevin P. Keating, Houston, TX, for Appellee.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and BOYCE.

## OPINION

ADELE HEDGES, Chief Justice.

Appellant, Marlin Deandre House, appeals from an order extending his involuntary inpatient mental health treatment for a period of one year. In two issues, appellant challenges the legal and factual suffi-

ciency of the evidence to support the order. We affirm.

## I. Background

On December 6, 1996, appellant killed his mother by stabbing her with a knife at least ninety-three times. Appellant was indicted for murder, but after a bench trial, the trial court found him not guilty by reason of insanity. The court subsequently ordered him committed to a state mental hospital and has recommitted him annually since 1998. Last year, this court considered the trial court's 2005 order of recommitment and reversed, effectively ordering appellant released to outpatient care. *House v. State*, 222 S.W.3d 497, 508 (Tex.App.–Houston [14th Dist.] 2007, pet. denied). During the pendency of the State's petition for review in that case, the trial court held a new hearing and issued the March 30, 2007 recommitment order currently before us. In our prior opinion, we held that the evidence was legally insufficient to support the order. *Id.* at 507. We based our decision largely on deficiencies with the report and testimony of the State's expert and the lack of evidence in the record that appellant had committed a recent overt act or exhibited a continuing pattern of behavior as contemplated by the controlling statutes. *Id.* at 504–07. Distinguishing the present appeal from the prior proceedings is the fact that (1) the State's expert testified with greater specificity in the trial court in the most recent recommitment hearing, and (2) in the year between hearings, appellant suffered a rapid decompensation episode when his medication was changed. Also, during that intervening year, appellant refused his medication at one point and reported hearing voices. We will begin by discussing the standards governing our review; we will then ana-

lyze the record in light of these standards.[1]

## II. Standards of Review

Under former article 46.03 of the Texas Code of Criminal Procedure, which is applicable to this case by virtue of the date of the offense, recommitment hearings for persons found not guilty by reason of insanity must be conducted pursuant to the Texas Mental Health Code. *See* Act of May 25, 1983, 68th Leg., R.S., ch. 454, 1983 Tex. Gen. Laws 2640, 2644–46 (repealed 2005) (current version at Tex.Crim. Proc. Code Ann. art. 46C.261 (Vernon Supp. 2006)). Under section 574.066 of the Mental Health Code, a court may renew an order for inpatient mental health services if it finds that the patient meets the criteria for involuntary commitment set forth in section 574.035(a) of the Mental Health Code. Tex. Health & Safety Code Ann. § 574.066(f) (Vernon 2003) (specifying the procedure for the renewal of an order for extended mental health services).

Section 574.035(a) provides that a court may order extended inpatient mental health services if the trier of fact finds, by clear and convincing evidence, that, among other requirements, the proposed patient meets the following criteria:

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

(C) is:

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

*Id.* § 574.035(a) (Vernon 2003). The trial court must specify which of the criteria under subsection (a)(2) forms the basis for the recommitment. *Id.* § 574.035(c).

In order to be clear and convincing under section 574.035(a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm (1) the likelihood of serious harm to the proposed patient or others, or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function. *Id.* § 574.035(e). The court cannot make its findings solely from certificates of examination for mental illness but shall "hear testimony." *Id.*

---

1. Although not raised by the parties, we had some concern that the reversal of the prior year's recommitment order may have rendered the present year's recommitment proceedings moot. However, the statutory scheme for involuntary commitment (1) makes each year's proceedings discrete, so that the present proceedings are not necessarily nullified by a reversal in a prior year, and (2) provides the same basic standard whether the matter is an initial commitment or a recommitment. *See* Tex. Health & Safety Code

Ann. § 574.035, .066 (Vernon 2003). We also recognize that there is a significant public safety consideration whenever a trial court deems someone "likely to cause serious harm to others," as the trial court has in the present case. *See State v. Roland*, 973 S.W.2d 665, 667 (Tex.1998). Accordingly, we find that the present year's proceedings are not rendered moot simply because the prior year's order was reversed. We will therefore review the current order on the merits.

§ 574.035(g). Furthermore, the trial court may not enter an order for extended mental health services unless appropriate findings are made and are supported by testimony taken at the hearing. *Id.* The testimony must include competent medical or psychiatric testimony. *Id.*

■■■ When the burden of proof is heightened to a clear-and-convincing standard, the sufficiency of the evidence standards of review are also heightened. *In re F.M.*, 183 S.W.3d 489, 492 (Tex.App.–Houston [14th Dist.] 2005, no pet.). In conducting a legal sufficiency review when the burden is clear-and-convincing, the reviewing court must consider all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002); *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979). In conducting a factual sufficiency review in this context, the reviewing court gives due consideration to evidence that the factfinder reasonably could have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. The ultimate inquiry is whether a reasonable factfinder could have resolved disputed evidence in favor of the finding. *Id.* The reviewing court must avoid supplanting it's own judgment in place of the factfinder's judgment. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## III. Evidence

The case below was a typical battle of experts. Testifying in support of appellant's recommitment, the State's expert, psychiatrist Mark Moeller, testified that he reviewed appellant's medical records and the offense report and interviewed appellant for "[p]robably a little over an hour." He opined that appellant suffers from paranoid schizophrenia and requires inpatient treatment because he presents "a fairly high level of future dangerousness." He stated that appellant has an elementary understanding of his illness and understands "that his bizarre thoughts led directly to [his mother's death]."

Moeller expressed concern about appellant's "ability to decompensate or recompensate" because of an incident that occurred in February 2007. One of appellant's medications was changed, apparently because the original medication caused weight gain. According to Moeller, appellant rapidly and severely decompensated to the point of requiring forced medication. Moeller described the incident as "a pretty bad situation ... even inside of a locked unit with all the doctors and nurses around." Appellant became very anxious, began rocking, and had problems breathing. He also screamed, otherwise talked loudly and repeated himself, and produced "[l]oud caterwauling," which Moeller defined as "animal-like sounds." Appellant also refused his nighttime medications. Although Moeller could not specifically identify the rejected medications, he said the troubling thing was that appellant refused the medications not the exact nature of those medications. Once appellant was put back on his original medication, it took him several weeks to return to his normal condition. Moeller further stated that during the decompensation episode, appellant reported hearing voices speaking directly to him from a television. Moeller found the report of auditory hallucinations to be particularly troubling because appellant was experiencing similar problems at the time that he killed his mother. Moeller additionally referenced a prior incident in which appellant avoided taking his medication by "cheeking" it, or hiding it in his

cheek until he could discard it. Moeller also mentioned that records showed appellant consumed alcohol while an inpatient in 2002. Moeller explained that "typically patients decompensate fairly rapidly and fairly aggressively when they start using other substances in addition to their prescribed medication." Moeller further noted that appellant also suffered a severe decompensation episode in 2003 when he did not receive his medications.

Moeller opined that if released, appellant would be in imminent danger of hurting himself and others. He said that if appellant stopped taking his medications, he would decompensate even more rapidly than he had when his medication was simply changed. Moeller said that if appellant decompensated after release, he could be a danger to other people because during the prior decompensation episode, appellant became grossly psychotic, heard voices, and refused medication. Moeller said that this was the same type of behavior appellant exhibited when he attacked his mother. Moeller explained that some patients take a long time to exhibit symptoms when they discontinue their medications, but appellant demonstrated a propensity for rapid decompensation probably because of the severity of his illness. Moeller said that appellant's propensity to rapidly decompensate meant that he was likely to be a danger if released.

Moeller specifically asserted that appellant is suffering from severe and abnormal mental, emotional, and physical distress, "based on his history and what he has to live with from his [sic] incident and also where he lives now." Moeller further opined that appellant has experienced severe mental or physical deterioration of his ability to function independently outside of a mental hospital. He based this opinion on the fact appellant has been monitored and taken care of since 1996 and thus would no longer possess certain skills, which would make it overwhelming for him to leave the hospital. Moeller expressed concern about appellant's refusal to permit contact with his family, despite requests from the family for such contact. Moeller said that when he discussed this with appellant, appellant said he preferred to not involve them and then refused to elaborate. Moeller said this constituted "unfinished business" for appellant, and it concerned Moeller that it might be "part of his underlying paranoia."

Moeller further opined that whether appellant was able to make a rational decision regarding submitting to treatment changed from day-to-day and that appellant could "very easily slide and start refusing treatment." In fact, according to Moeller, appellant did refuse treatment in February 2007 when he refused his medication. Moeller also based this assessment on notes by appellant's treatment team suggesting he continued to deny understanding the reasons for his admission to the State hospital and the fact he refused to sign releases to permit family contact.

Moeller acknowledged that he could not point to anything specific occurring after the date of the prior recommitment order that demonstrated appellant would harm himself or someone else. He did, however, testify that appellant's mental illness was exhibited in a continuing pattern of behavior. He said that appellant's paranoid ideation likely resulted in his refusal to sign releases allowing contact with his family. Moeller also identified other continuing symptoms of appellant's paranoid schizophrenia, including social withdrawal and an oddness in his speech and his perceptions. When asked under what circumstances appellant could safely be released, Moeller suggested that if appellant was successfully placed on a longer-acting in-

jected medication and then placed under very capable surveillance, he might safely be released.

Jerome Brown, a clinical psychologist, testified in support of appellant's release. He first evaluated appellant's condition in 2000 and did so again in March 2007. For the most recent evaluations, Brown interviewed appellant for about an hour and a half and reviewed appellant's medical records. Brown stated that appellant suffers from paranoid schizophrenia, but he disagreed with Moeller's opinion that appellant was likely to harm himself or others because of his rapid and severe decompensation. Brown opined that it was "professionally unacceptable" to "judge [appellant] on the basis of a single episode." He said that a patient needed to exhibit a pattern of behavior before such a conclusion could be reached. He further stated that while appellant did "become sicker" as a result of the change in his medication, he did not become dangerous. Brown described the decompensation episode as moderate to severe and emphasized that during it, appellant did not deteriorate to anywhere near the level that he had reached when he assaulted his mother. Brown agreed that had appellant stopped taking medication altogether, the episode would probably have been worse, although it was unclear whether he would have become violent. While Brown acknowledged concern that appellant refused medication during the decompensation episode, he pointed out that appellant's judgment had deteriorated at that point because of the decompensation.

Brown said that he understood the record references regarding appellant's hearing voices from the television to be historical in nature and not a statement that appellant heard voices during the most recent decompensation episode. However, Brown acknowledged that appellant reported hearing voices within the year before the interview, only not from the television. Also during their interview, appellant expressed to Brown that he understood the importance of telling a doctor if he began to hear voices. Appellant also said he understood that the medications prevented his hallucinations. Based in part on these representations, Brown concluded that appellant's awareness of his illness was "about as good as you can expect," which is to say a workable, practical knowledge but not a sophisticated one. Appellant also exhibited a working knowledge of how his transition to release would work and an understanding that he would need to take medication for the rest of his life.

Regarding appellant's refusal to sign release forms for family contact, Brown stated that there could be other reasons beyond paranoid ideation for the refusal. Appellant told Brown that he didn't want to bother or burden his family but that he actually had been in contact with them. When asked whether there was any evidence of a recent overt act that showed appellant was likely to be dangerous, Brown responded: "No, not that he's spontaneously or independently exhibited, no." When asked if appellant was likely to be a danger if released, Brown said: "I don't think he represents any danger on the basis of what we can reasonably expect from his current status and his current behavior. As we see him today, I don't think this man represents a danger to anyone." Brown additionally stated that there was "little or nothing left that [appellant] could do to better … make himself more acceptable for release." He blamed appellant's decompensation episode on what he termed doctors' "interventions," but acknowledged that there was no way to prevent such interventions if appellant were treated on an out-patient basis.

Debra Osterman, a psychiatrist with the Mental Health and Mental Retardation Authority (MHMRA) of Harris County, also testified in support of appellant's release. She stated that she has been treating appellant intermittently for over ten years. She said that it was initially difficult to get him stabilized, and he had a couple of early decompensation episodes when he stopped taking his medications. However, she said that since the early period, he has done remarkably well. Appellant has even been given "green card privileges" at the hospital, which affords him a significant degree of freedom of movement within the facility grounds. This led to one instance about three years before when appellant walked off the grounds to get a hamburger and then walked back. Osterman was unconcerned by this conduct because she said that a less trustworthy patient could have obtained "all sorts of harmful items" under such circumstances.

Osterman further testified that in February 2007, appellant asked about having his medication changed because it was causing him to gain weight. Osterman approved the change beginning on February 5, and appellant thereafter decompensated. Osterman blamed herself for the episode becoming as severe as it did; she went out of town for several days immediately after changing appellant's prescription. She said that the episode did not alarm her and did not cause her to conclude that appellant was likely to harm himself or anyone else. She said that the mere fact that appellant was screaming during the episode did not alarm her absent suicidal or homicidal threats. Osterman categorized the incident as moderate to severe and opined that it was better for a patient to decompensate rapidly because the change would then be readily noticed and reported.

Osterman further clarified her notes in appellant's medical history regarding auditory hallucinations around the time of the decompensation episode by saying that the notes were historical only and not a report of new hallucinations. She also stated that she "tend[ed] to think" that appellant's refusal to authorize contact with his family was not a symptom of paranoia. Osterman concluded that appellant's symptoms were typical for paranoid schizophrenia and that most people with that disorder are not dangerous to themselves or others.

David Tristan, a rehabilitation clinician and court resource coordinator for MHMRA, testified regarding the outpatient facilities and services that would be available to appellant upon his release. Tristan stated that there is one independent living residence, Northline SRO ("single resident occupants"), that was available to appellant. At this facility, residents have their own rooms and are expected to take care of themselves. He said that they have management staff at that location and that the New Start program offered "daily group outpatient psycho-social treatment" that appellant would be eligible to attend. Appellant could also see a doctor associated with that program once or twice a month as needed. He would have both a service coordinator, who would monitor him and refer him to appropriate services, and a counselor, who would conduct group or individual sessions as required. Tristan also explained that the court could craft highly specific orders dictating the terms and conditions of release, particularly in regard to treatment and the action to be taken in the event appellant violated the conditions. Tristan stated that the Northline SRO facility was able to monitor medicine intake during weekdays but not on weekends; he was unsure whether they would monitor intake at night. He further said that while the New Start program always had someone on call

if the court wanted to designate contact with appellant during weekends, Northline SRO itself did not monitor residents.

The record also contains a letter to the court from C.G. Plyler, a psychiatrist at Rusk State Hospital, supporting appellant's release. In the letter, Plyler states that appellant has responded well to medication and has been "completely cooperative and compliant" with treatment in his present stint at the hospital. Plyler concludes that appellant "has achieved a level of insight somewhat rare in this condition that will serve to protect him from the dangerous reality distortions he has suffered in the past and he seems determined to continue in psychiatric care to ensure that eventuality."

## IV. Legal Sufficiency

■ In his first issue, appellant argues that the evidence is legally insufficient to support the trial court's recommitment order. To support appellant's recommitment, there must be clear and convincing evidence in the record to demonstrate that appellant is mentally ill and as a result he either (1) is likely to cause serious harm to himself; (2) is likely to cause serious harm to others; or (3) is (a) suffering severe and abnormal mental, emotional, or physical distress; (b) experiencing substantial mental or physical deterioration of his ability to function independently, and (c) unable to make a rational and informed decision as to whether or not to submit to treatment. Tex. Health & Safety Code Ann. § 574.035(a). We first note that it is undisputed that appellant remains mentally ill, thus fulfilling the initial requirement for commitment under section 574.035(a). Although the trial court did not make express written findings regarding which of the secondary criteria it relied on in ordering recommitment, the parties focus their arguments on the first two, debating whether the evidence shows appellant is likely to cause serious harm to himself or others.[2] As set forth above, in order to be clear and convincing regarding dangerousness to self or others, the record must include evidence of a recent overt act or a continuing pattern of behavior that tends to confirm the likelihood of serious harm to the patient or others. See id. § 574.035(e); *Martin v. State*, 222 S.W.3d 532, 534–35 (Tex.App.–Houston [14th Dist.] 2007, pet.denied). We will narrow our analysis further to consider whether the evidence supports the conclusion that if released, appellant is likely to cause serious harm to others.[3]

Key support for the conclusion that appellant is likely to cause serious harm to others comes from evidence that (1) appellant killed his mother by stabbing her at least 93 times with a knife; (2) appellant refused medication within the year prior to the recommitment hearing and has previously "cheeked" medication to prevent tak-

---

2. The trial court's order states generally that appellant "still meets the criteria for involuntary commitment." At the conclusion of the hearing, the trial judge stated that she "tend[ed] to agree with the assessment that the State has just announced, i.e., Dr. Moeller's testimony in regards to his behavior." In closing argument, the State's attorney spoke to all three of the possible bases for recommitment, including danger to self and others. The judge went on to specifically discuss the elements of the third possible basis for recommitment, i.e., the patient's dis-

tress and the deterioration of his ability to function.

3. Although there is some evidence that appellant has experienced suicidal thoughts in the past, the record does not appear to reflect that he has previously inflicted harm on himself. For this and other reasons, we find the evidence more compelling regarding the likelihood of harm to others. Accordingly, we need not address the harm-to-self criterion for recommitment.

ing it; (3) appellant has experienced auditory hallucinations within the year, and such hallucinations were present when appellant violently attacked his mother; (4) appellant moderately to severely decompensated when his medication was changed, has had at least one such incident while hospitalized in the past, and would be likely to decompensate even more severely if his medication stopped altogether; (5) the facility that has agreed to receive appellant as a resident does not provide monitoring services; and (6) if released, appellant would be responsible for administrating his own medication at times. Based primarily on these facts, Moeller, the State's expert, concluded that appellant presents "a fairly high level of future dangerousness." Moeller further testified that in his opinion, appellant's propensity to rapidly decompensate means he is likely to be a danger if released. He opined that appellant could "very easily slide and start refusing treatment" because his ability to make rational decisions regarding treatment waxed-and-waned. Moeller additionally interpreted appellant's behavior during the decompensation episode as being similar to the conduct he exhibited when he attacked his mother. Moeller also pointed to appellant's having obtained and consumed alcohol during his hospitalization, opining that taking alcohol could cause appellant to decompensate "rapidly" and "aggressively."

■ Appellant first argues that the evidence does not support the conclusion that

he is likely to stop taking his medication. We disagree. As stated, the evidence shows that appellant refused medication in February 2007 and that he had previously been "cheeking" medication.[4] Furthermore, Moeller expressed serious doubt as to whether appellant would be capable of consistently staying on his medication given the "waxing and waning" of appellant's understanding of his condition and the fact that if released, appellant would at times be responsible for administering his own medicine. Appellant also points out that his refusals to take medication have been isolated incidents over a period of years. However, the evidence supports the conclusion that it would only take one such incident for appellant's condition to deteriorate rapidly and severely.[5]

Next, appellant argues that even if he stopped taking his medication, the evidence does not support the conclusion that his outpatient care givers would fail to detect this fact or fail to notice changes in his demeanor. While the record shows that daily contact with care givers could be arranged, the record also reveals that at times, appellant would be responsible for his own medication, and the facility where he would be placed if released does not provide patient monitoring. Indeed, evidence shows that residents of that facility have significant autonomy. Thus, appellant's failure to take medication could likely go undetected as could his absence from the premises. Additionally, the detailed evidence regarding appellant's propensity to rapidly and severely decompensate

**4.** Appellant points out that the record does not reveal exactly what medication he refused in February 2007. As Moeller stated in his testimony, the important aspect of the occurrence is *that* appellant refused medication prescribed by his doctors not *what* medication he refused.

**5.** Appellant additionally notes that refusal to take medication is not per se an overt act

sufficient to require commitment, citing *In re F.M.*, 183 S.W.3d 489, 494–95 (Tex.App.–Houston [14th Dist.] 2005, no pet.). While we agree with this general point, the evidence demonstrates that appellant's refusal to take medication is just one factor among many (as detailed in this opinion) that warrants appellant's continued commitment.

when his medication intake is inconsistent (as in a simple change from one medication to another), suggests that it would not take appellant long to go from seemingly fine to dangerous. Experts agreed that appellant's decompensation would probably be even more severe if he completely stopped taking his medication. Based on this evidence, the trial court would not have been unreasonable in concluding that care givers would likely not identify appellant's failure to take medicine in time to prevent harm to others.

Appellant further suggests that there is no evidence he would become violent if he stopped taking his medication. It is undisputed appellant stabbed his mother to death when his condition was untreated prior to his commitment. Moeller stated that several of the symptoms appellant suffered during his decompensation episode were similar to symptoms he suffered at the time of the assault on his mother. This evidence and expert opinion is sufficient to support the conclusion appellant is likely to become violent if released.

Appellant cites *Broussard v. State*, among other cases, for the propositions that (1) bare expert opinion as to potential dangers is not sufficient to warrant an individual's recommitment, and (2) evidence that an individual is mentally ill and in need of hospitalization does not without

more meet the statutory requirements for recommitment. 827 S.W.2d 619, 622 (Tex. App.–Corpus Christi 1992, no pet.). While we do not necessarily disagree with the *Broussard* court's analysis or that in the other cited cases, it is clear here that Moeller's opinions regarding appellant's dangerousness were well-grounded in the evidence.[6]

Lastly, appellant emphasizes several portions of the testimony from Moeller, Brown, and Osterman, including to the effect that appellant (1) possesses a certain level of understanding concerning his condition; (2) did not cause his most recent decompensation episode; (3) understands he needs to tell his doctors if he starts hallucinating; (4) has been given special "green card" privileges and has not seriously abused them; and (5) decompensates rapidly thus making it more likely care givers would notice. Although each of these points may have played a role in the trial court's analysis, we find that none of them were of such weight as to render Moeller's testimony inaccurate or the trial court's holding unreasonable.

In summary, we find that the evidence regarding appellant's decompensation in February 2007 shows a recent overt action that considered in light of appellant's medical history, tends to confirm the likelihood

---

**6.** Appellant discusses in detail the unpublished case of *Whitaker v. State*, Nos. 01–03–00576–CV, 01–03–00577–CV, 2003 WL 22413511 (Tex.App.–Houston [1st Dist.] October 23, 2003, no pet.). The State's expert in *Whitaker* testified that the patient in question continued to suffer from a mental illness, which involved paranoia as well as delusions that he owned large amounts of property. *Id.* at *3. The expert further opined that if released, the patient could "very easily go on to a piece of property that somebody else owns and tell them that this is my piece of property, and an argument [would] ensue." *Id.* In reversing the trial court's order of recommitment, the court of appeals held that the

State's expert improperly relied solely on evidence of the patient's mental illness and did not identify a recent overt act or pattern of behavior that tended to confirm the likelihood of serious harm should the patient be released. *Id.* at *3–4. In the case before us, Moeller testified at length regarding not only appellant's illness but also his current condition and the specifics of his 2007 decompensation episode. Based on his analysis of these factors and appellant's violent past, Moeller concluded that appellant is likely to be a danger to others if released. Consequently, we find appellant's citation to and discussion of the *Whitaker* case to be inapposite.

of serious harm to others. *See* Tex. Health & Safety Code Ann. § 574.035(e); *House*, 222 S.W.3d at 500, 507. We further find that the facts listed above, taken in conjunction with Moeller's expert testimony, support the conclusion that if released, appellant would likely cause serious harm to others. Accordingly, we overrule appellant's first issue.

## V. Factual Sufficiency

■ In his second issue, appellant contends that the evidence is factually insufficient to support the trial court's recommitment order. As stated above, our ultimate inquiry in this context is whether a reasonable factfinder could have resolved disputed evidence in favor of its findings. *See In re J.F.C.*, 96 S.W.3d at 266. Under this issue, appellant primarily asserts that the trial court as factfinder could not have reasonably resolved the discrepancies between the experts' testimonies in favor of recommitting appellant. He stresses Osterman's years of experience working with appellant and Brown's experience in testifying in mental health hearings, while generally attacking Moeller's testimony as "lacking in substance [and being] vague ... circuitous ... and speculative." However, the trial court, as factfinder and sole judge of the credibility of the witnesses, was within its discretion in finding the testimony from Moeller to be more credible than that from Osterman and Brown. *See, e.g., Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988); *N.N. v. Inst. for Rehab. & Research*, 234 S.W.3d 1, 17, 21 (Tex.App.–Houston [1st Dist.] 2006, no pet.).

Appellant additionally argues that the trial judge's comments during the hearing demonstrated that she "misapprehended several undisputed material facts." [7] Specifically, appellant references the judge's statements regarding appellant's "going off" his medication, decompensating, and becoming aggressive. Regarding medication, appellant says that there is no evidence to support the statement that appellant has ever "gone off his medication," but only that a change in his medication caused the decompensation episode. However, the judge's comment was broad enough to include the fact that appellant did stop taking one medication when it was replaced by another. Appellant had in effect "gone off" the original medication. Additionally, the record also supports the conclusion that appellant, in fact, did refuse his medication during the decompensation episode.

Regarding the decompensation comment, appellant argues that decompensating alone is insufficient to support the recommitment order.[8] Regardless of the validity of appellant's argument, it does not advance appellant's assertion that the trial judge misapprehended material facts. It is undisputed that appellant decompensated in February 2007.

Lastly, appellant contends that there is no evidence to support the trial judge's statement that appellant became aggressive during the decompensation episode. We begin by noting that the word "aggressive" does not necessarily suggest violent behavior but means "[i]nclined to ... act in a hostile fashion." *See The Am. Heri-*

---

7. The legal basis for appellant's argument is unclear from his brief; nonetheless, we will address the argument as raised.

8. In support of this assertion, appellant cites *T.G. v. State*, 7 S.W.3d 248, 252 (Tex.App.–Dallas 1999, no pet.). In *T.G.*, the court stated that evidence which merely demonstrates a person is mentally ill is not sufficient to satisfy the statutory standard for commitment. *Id.* We disagree with appellant's assertion that the decompensation episode is merely evidence that appellant has a mental illness.

*tage Dictionary* 87 (2d College Ed.1991). "Hostile" in turn can be defined as "antagonistic." *Id.* at 624. There is evidence that during the decompensation episode, appellant screamed loudly, talked repetitively, refused medication, and produced loud "caterwauling." Under the circumstances, this conduct could be interpreted as aggressive even though it was not violent. Because we find no merit in appellant's arguments under this issue, we overrule appellant's second issue.

We affirm the trial court's order.