**Opinion issued October 13, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00075-CV

———————————

## IN RE COMMITMENT OF J.S.T.

---

**On Appeal from the 122nd District Court**
**Galveston County, Texas**
**Trial Court Case No. 14-CV-1323**

---

## O P I N I O N

This is an appeal from a jury verdict involuntary committing appellant, J.S.T., to the Texas Center for Infectious Disease on an inpatient basis for treatment of tuberculosis. In two issues, J.S.T. argues that: (1) the evidence is insufficient to sustain the order for involuntary commitment; and (2) the trial court

erred in requiring him to participate in the trial solely though video teleconferencing.

We affirm.

**Background**

In April 2014, J.S.T. sought treatment at the Clear Lake Regional Hospital ("Clear Lake") for chest pain, and the hospital later diagnosed him with active tuberculosis. Although Harris County health officials initially started J.S.T. on treatment for the disease, they were only able to give him the first ten doses of a lengthy treatment regimen before they were unable to locate him again. In June 2014, J.S.T. was incarcerated in Galveston and given a skin test for tuberculosis, which came back negative. J.S.T. began treatment again in early July, but refused to take his medication consistently. Once he was released from the Galveston jail, Harris County was unable to locate his whereabouts to continue treatment.

In November 2014, J.S.T. requested a free blood test for tuberculosis from the Galveston County Health District ("GCHD"). When asked whether he had received a positive skin test before by GCHD, J.S.T. responded that he had not. J.S.T.'s blood test came back positive, and GCHD determined that he should be restarted on treatment. GCHD also gave J.S.T. a written "order to implement and carry out measures for a patient with tuberculosis and a warning letter." It informed J.S.T. that he likely had a "serious communicable disease" and that he

2

was required to continue treatment or "court proceedings may be initiated against [him]." J.S.T. began treatment, and although he had a sputum smear test negative for tuberculosis, the sputum culture still tested positive for a tubercular infection. However, after seven days of treatment, GCHD was unable to locate him until mid-December when he was incarcerated again in Galveston.

GCHD then filed its application for temporary protective custody of J.S.T. on December 17, 2014. On December 18, 2014, GCHD presented its application for extended management over J.S.T. stating that because he "presents a threat to the public health" and had "refused to follow several written treatment orders given to him," the trial court should order involuntary inpatient treatment over him.

On January 9, 2015, J.S.T.'s counsel filed a "Request for Health Authority to Advise the Court of Appropriate Control Measures and, If Necessary to Allow [J.S.T.] to Participate by Teleconference." This request cited Health and Safety Code section 81.169 and asked that "the health authority . . . advise the Court on appropriate health measures to prevent the transmission of the communicable disease alleged in the application, and if necessary to protect the health and safety of the judge, jurors, and the public, to have [J.S.T.] appear by teleconference." In support of this request, J.S.T.'s counsel cited the facts that GCHD had presented evidence at previous hearings that J.S.T. had been diagnosed with tuberculosis and had started and stopped treatment multiple times; at least two family members had

3

tested positive for tuberculosis and believed they had contracted the disease from him; he does not believe he has tuberculosis or that he is contagious; he believes he is the victim of a conspiracy that includes GCHD, the trial court, and his attorney; he was removed from the courtroom at a previous hearing, and his attorney "believes he may be disruptive before a jury"; and while the public health could be protected by requiring him to wear a surgical mask, "it is not possible to determine whether he will keep a mask on if he becomes agitated during trial." J.S.T.'s counsel requested that a hearing be held prior to the trial to determine which protective measures would be necessary.

The trial began on January 12, 2015. GCHD first put on evidence regarding the need to have J.S.T. appear at the trial via video teleconference. Dr. Harlan Guidry, the Galveston County Health Authority and Director of GCHD, testified that J.S.T. "must remain in isolation or quarantine and that exposure to the Judge, jurors, or public would jeopardize the health and safety of those persons and the public health." The trial court also took judicial notice of a hearing that took place in December 2014 during which J.S.T. exhibited unsafe behavior and "indicated [that] he would leave the courtroom without permission of the Court." Accordingly, the trial court found that that it was necessary to require J.S.T. to appear from the jail via video teleconferencing. No one, including J.S.T., objected to this finding of the trial court. At no point in the proceeding did J.S.T. object to

4

appearing via video-teleconferencing or otherwise indicate that he was not able to participate fully in the proceedings.

Eileen Dawley, a registered nurse and GCHD's Tuberculosis Program Manager, testified that in April 2014 Harris County health officials had diagnosed J.S.T. with active tuberculosis based on a sputum culture and chest x-ray showing a "cavitary lesion," or damage to his lung caused by the disease. GCHD had confirmed the diagnosis in November 2014 via a blood test. She also testified regarding J.S.T.'s treatment history and his failure to complete any course of treatment begun either in Harris County or in Galveston County. Dawley testified that health authorities track a patient's treatment "to prevent drug resistance and make sure people complete the entire course of treatment because it does go on for so long." She stated that drug resistance "is a real risk when you start medicine, only take if for a little while and stop it and then restart it." She also testified that the typical course of treatment lasts between six and nine months.

Dawley stated that it was possible to have a negative skin test, as J.S.T. did in June 2014, and still have tuberculosis. She testified that the "gold standard" for diagnosing tuberculosis was the sputum culture and that J.S.T. had tested positive for tuberculosis through both a sputum culture and blood tests. She testified that treatment was necessary to recover from an active tubercular infection such as J.S.T.'s. She also testified that it was possible that someone could have active

tuberculosis but not exhibit any of the typical symptoms such as a productive cough or weight loss.

As of the time of trial, Dawley testified that J.S.T. "still has the active TB disease." She also stated that he was refusing to cooperate with providing sputum samples for testing and that he was not taking his medication. She stated that "there's no way of knowing if he's contagious without a sputum specimen." However, Dawley also testified that Harris County conducted a "contact investigation" and determined that four of the seven people listed as contacts by J.S.T. also tested positive for tuberculosis. She explained that he had had a negative sputum smear in November 2014 while he was being treated by GCHD, but J.S.T. later quit taking the medication. However, because he had been unmedicated for a period of time and still had the active disease, as demonstrated by his positive sputum culture,[1] GCHD "had to assume that he's contagious because he had the disease in his lungs. And for the sake of public health, we don't know at that point if he's contagious or not but we err on the side of caution and say that he is until we have a sputum that says he's not contagious." Dawley testified that she believed, based on all the information that she had, that J.S.T.

---

[1] The medical experts testified that a sputum smear is a screening tool in which a sample of sputum is examined under the microscope for indications of tubercular infection. A sputum culture "takes a little bit longer" than a smear and is a more accurate test. The experts testified that a sputum smear can be unreliable and that a sputum culture is the "gold standard" for diagnosing tuberculosis.

"probably is" contagious and that he would not comply with the health district's orders if left on his own.

As he was completing his cross-examination of Dawley, J.S.T.'s trial counsel asked for permission to call J.S.T., stating that he wanted to be sure J.S.T. did not have any other concerns that needed to be addressed with that witness. The trial court granted permission for the phone call and allowed J.S.T.'s attorney to ask additional questions on cross-examination following the call.

Dr. Guidry testified that tuberculosis is a bacteria that is "transmitted through the air from one person to another" and can "lead to death" if left untreated. The average case of tuberculosis takes "six to nine months for full treatment," and a drug-resistant strain of the bacteria can develop from "lapses in treatment." Dr. Guidry stated that tuberculosis was a "number one" public health concern because it "is a very complex disease" that is "hard to identify" and is difficult to treat. Dr. Guidry testified that treatment is complex "because of the long period of time it takes to treat it" and because "it takes multiple drugs to treat it."

Dr. Guidry testified that lapses in treatment lead to drug resistance in tuberculosis and that drug-resistant tuberculosis was increasingly becoming a pressing public-health problem. Disease resistance makes it more difficult for health professionals to find drugs to treat it. It can also take "much longer" than

the average six to nine months to complete treatment of drug resistant tuberculosis and "[i]t's more deadly."

Regarding J.S.T. specifically, Dr. Guidry testified that he was infected with tuberculosis, a communicable disease, and that he posed a threat to public health. Dr. Guidry stated, "[T]uberculosis by nature is infectious and it will not go away on its own and it will get worse and worse and more people will unintentionally be exposed to it." Dr. Guidry also believed that J.S.T. himself might "eventually die" from the disease if he remained untreated. He testified that J.S.T.'s negative sputum smear in November 2014 did not indicate that he was not contagious; rather, the sputum smear was a screening tool and was not as definitive as a test to detect the DNA of tuberculosis. J.S.T.'s sputum culture had tested positive for the presence of tuberculosis DNA, "so, it's being released from his respiratory secretions which would constitute contagiousness."

Dr. Guidry testified that J.S.T. was probably contagious "given his entire profile, health condition, multiple test diagnoses, reasonable certainty would be that it's positive and, in fact, his culture did grow the organism." Dr. Guidry stated that, acting as the Galveston County Health Authority, he had ordered J.S.T. to undergo treatment, and J.S.T. had failed to comply with his orders. He stated that J.S.T. would need treatment for approximately six to nine months.

J.S.T., appearing through video-teleconferencing, testified at the trial as well. He stated on the record that he had been able to hear the testimony of the other witnesses. He disputed various parts of GCHD's evidence regarding his treatment. He stated that he was not diagnosed with tuberculosis when he sought treatment at Clear Lake and that Harris County never treated him for the disease. He testified that he had sought medical treatment on numerous occasions, and no one told him he had tuberculosis until he was tested in jail in Galveston, where he was quarantined and told "that [he] had TB but it is not contagious, that it is dormant." J.S.T. stated that he had "no problem taking medicine" but he did not want "to do it on a day to day basis where [he] need[ed] to meet someone every day" because he did not live in Galveston County. He also testified that he did not feel sick and did not believe that he had tuberculosis. He stated, "I'm pretty sure I'm not contagious because I've never been contagious, never had a positive TB test on a skin test." He acknowledged that he took only about seven doses of the prescribed medication before leaving the area because he had to work. J.S.T. testified that he believed GCHD was harassing him in trying to treat him for a disease he did not believe he had and in making him take medicine he did not want.

Following a jury trial, the trial court found that J.S.T. was "infected with a communicable disease . . . that presents a threat to the public health and ha[d]

9

failed to follow the orders of the health authority"; that he was "likely to cause serious harm to himself" and "if not examined, observed, isolated, or treated" would "continue to endanger public health"; and that his condition would continue for more than ninety days.

Accordingly, the trial court then ordered that J.S.T. be committed to the Texas Center for Infectious Disease on an inpatient basis for a period of up to twelve months. J.S.T. filed his notice of appeal and this appeal followed.

## Sufficiency of the Evidence

In his first issue, J.S.T. challenges the sufficiency of the evidence supporting the jury's findings.

### A. Standard of Review

Commitment of a person with a communicable disease must be based on clear and convincing evidence. TEX. HEALTH & SAFETY CODE ANN. §§ 81.169(h), 81.173(a) (Vernon 2010). In conducting a legal sufficiency review under such a standard, the reviewing court must consider all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *House v. State*, 261 S.W.3d 244, 247 (Tex. App.—Houston [14th] 2008, no pet.). In conducting a factual sufficiency review in this context, the reviewing court gives due

10

consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266; *House*, 261 S.W.3d at 247. The ultimate inquiry is whether a reasonable factfinder could have resolved disputed evidence in favor of the finding. *In re J.F.C.*, 96 S.W.3d at 266; *House*, 261 S.W.3d at 247.

**B.     Analysis**

Involuntary commitment for treatment of a communicable disease is governed by Health and Safety Code chapter 81, which provides:

> If the department or a health authority has reasonable cause to believe that an individual is ill with, has been exposed to, or is the carrier of a communicable disease, the department or health authority may order the individual . . . to implement control measures that are reasonable and necessary to prevent the introduction, transmission, and spread of the disease in this state.

TEX. HEALTH & SAFETY CODE ANN. § 81.083(b) (Vernon Supp. 2014). Moreover, a court may issue an order of extended management over an individual if it finds from clear and convincing evidence that:

> (1) the person is infected with a communicable disease that presents a threat to the public health and, if the application is for inpatient treatment, has failed to follow the orders of the health authority or department;
>
> (2) as a result of that communicable disease the person:
>
> (A) is likely to cause serious harm to himself; or
>
> (B) will, if not examined, observed, isolated, or treated, continue to endanger public health; and

> (3) the person's condition is expected to continue for more than 90 days.

TEX. HEALTH & SAFETY CODE ANN. § 81.173(a).

In his brief on appeal, J.S.T. argues that the evidence was insufficient to support the jury's findings on all elements of section 81.173(a).

Regarding the first element, both Dawley and Dr. Guidry presented clear and direct testimony that tuberculosis is a disease that presents a threat to the public health and is likely to cause serious harm to J.S.T. Dr. Guidry testified that tuberculosis is a complex disease that is transferred through the air and can lead to death if left untreated. GCHD presented evidence, through Dawley's testimony and medical records, that J.S.T. had tested positive for active tuberculosis on two separate occasions based on a sputum test and a blood test. J.S.T. argues that his skin test was negative, but both Dawley and Dr. Guidry testified that the skin test was not reliable and that the sputum culture and blood test results indicated that he was infected with active tuberculosis.

GCHD also presented J.S.T.'s medical records and Dawley's and Dr. Guidry's testimony that J.S.T. failed to follow GCHD's orders. GCHD presented the copy of the order and warning letter given to J.S.T. and signed by him in November 2014, requiring him to keep all of his appointments with GCHD staff and to complete his course of treatment. Dawley testified that J.S.T. failed to do so,

12

and J.S.T. himself acknowledged that he took only one week's worth of medication before he left the area and missed his remaining appointments. Therefore, a reasonable juror could have formed a firm belief or conviction that J.S.T. was infected with a communicable disease that presented a threat to the public health and that he failed to follow the orders of the health authority or department. *See* TEX. HEALTH & SAFETY CODE ANN. § 81.173(a)(1); *In re J.F.C.*, 96 S.W.3d at 266.

The evidence is likewise legally and factually sufficient to show that, as a result of the tuberculosis, J.S.T. is likely to cause serious harm to himself or endanger public health if he is not treated. *See* TEX. HEALTH & SAFETY CODE ANN. § 81.173(a)(2). Dr. Guidry testified that an individual is more likely to create a drug-resistant strain of tuberculosis if there are lapses in treatment, and a drug-resistant strain of tuberculosis is more difficult to treat than the ordinary strain of tuberculosis. If an individual's failure to comply with the treatment regimen increases the likelihood that he will create a drug-resistant strain of tuberculosis and spread it to others. J.S.T. had stopped and restarted treatment at least three times over a course of eight months and, as a result, had increased his chances of developing a resistance to treatment. Moreover, J.S.T. admitted at trial that he did not believe he has tuberculosis and did not want to take the medication on a day-to-day basis. He demonstrated that he cannot be relied upon to finish his treatment by

disappearing multiple times shortly after beginning treatment without informing Harris County or GCHD.

GCHD also presented evidence that four of the seven people J.S.T. listed as contacts also tested positive for tuberculosis. In spite of J.S.T.'s negative sputum smear results, both Dawley and Guidry testified that his positive sputum cultures indicated that J.S.T. was most likely contagious and required treatment. Dawley and Dr. Guidry both testified that tuberculosis is a complex disease that requires treatment and will not go away on its own. Untreated tuberculosis can lead to the disease spreading from the lungs to other organs and can eventually cause death.

Thus, with due consideration to the evidence, a reasonable factfinder could have formed a firm belief or conviction that J.S.T. will continue to be a risk to the public health if he is not forcibly treated. *See* TEX. HEALTH & SAFETY CODE ANN. § 81.173(a)(2); *In re J.F.C.*, 96 S.W.3d at 266.

Finally, the evidence is both legally and factually sufficient to demonstrate that J.S.T.'s condition will last for more than ninety days. *See* TEX. HEALTH & SAFETY CODE ANN. § 81.173(a)(3). Dawley and Dr. Guidry testified that the average case of tuberculosis takes up to nine months for treatment and could take even longer in the case of a drug resistant strain of the disease. Thus, the evidence is both legally and factually sufficient to support all three requirements. *See* TEX. HEALTH & SAFETY CODE ANN. § 81.173(a); *In re J.F.C.*, 96 S.W.3d at 266.

14

We overrule J.S.T.'s first issue.

## Appearance Through Teleconferencing

In his second issue, J.S.T. argues that the trial court erred in requiring him to participate in the trial solely through video teleconferencing.

## A.    Standard of Review

Generally speaking, trial judges have broad, though not unfettered, discretion in handling trials. *In re Commitment of Anderson*, 392 S.W.3d 878, 885 (Tex. App.—Beaumont 2013, pet. denied) (citing *Metzger v. Sebek*, 892 S.W.2d at 20, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("Every trial court has the 'inherent power' to control the disposition of the cases on its docket 'with economy of time and effort for itself, for counsel, and for litigants.'")). "How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Metzger*, 892 S.W.2d at 38 (citing *Landis v. North Am. Co.*, 299 U.S. 248, 254–55, 57 S. Ct. 163, 166 (1936)).

The Health and Safety Code sets out the general requirements for a hearing on an application for a court order for management of a person with a communicable disease[2] and provides in relevant part:

---

[2]    In his brief on appeal, J.S.T. cites the requirements of Health and Safety Code section 573.202. This provision governs a trial court's authority to "permit a physician or a nonphysician mental health professional to testify at a hearing or proceeding by closed-circuit video teleconferencing" and is not applicable here. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.202(a) (Vernon 2010).

(c) The health authority shall advise the court on appropriate control measures to prevent the transmission of the communicable disease alleged in the application.

(d) The person is entitled to be present at the hearing. The person or the person's attorney may waive this right.

. . . .

(i) Notwithstanding Subsection (d), if the health authority advises the court that the person must remain in isolation or quarantine and that exposure to the judge, jurors, or the public would jeopardize the health and safety of those persons and the public health, a judge may order that a person entitled to a hearing may not appear in person and may appear only by teleconference or another means that the judge finds appropriate to allow the person to speak, to interact with witnesses, and to confer with the person's attorney.

TEX. HEALTH & SAFETY CODE ANN. § 81.169.

Furthermore, to preserve error for appeal, an appellant must make a timely request to the trial court stating the specific grounds for the ruling desired, if the grounds are not obvious from the context, and he must obtain a ruling on the requested relief. *See* TEX. R. APP. P. 33.1(a). Even constitutional complaints can be waived if the party fails to assert them at trial. *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001).

B. **Analysis**

Prior to trial, J.S.T.'s attorney filed a request pursuant to Health and Safety Code section 81.169(c) for GCHD to advise the court of appropriate control measures to prevent the transmission of the communicable disease alleged in its

16

application, and "if necessary to protect the health and safety of the judge, jurors, and the public, to have [J.S.T.] appear by teleconference." J.S.T.'s attorney requested that the trial court hold a hearing prior to the commencement of trial to determine what control measures would be appropriate. In accordance with this request, the trial court began J.S.T.'s trial by receiving evidence on the necessity of his appearing through video-teleconferencing. Dr. Guidry testified that J.S.T. "must remain in isolation or quarantine and that exposure to the Judge, jurors, or public would jeopardize the health and safety of those persons and the public health," and the trial court took judicial notice of a December 2014 hearing during which J.S.T. exhibited unsafe behavior and "indicated [that] he would leave the courtroom without permission of the Court."

The trial court found that that it was necessary to require J.S.T. to appear from the jail via video teleconferencing. No one, including J.S.T., objected to this finding of the trial court. At no point in the proceeding did J.S.T. object to appearing via video-teleconferencing or otherwise indicate that he was not able to fully participate in the proceedings. Rather, he testified on his own behalf and stated on the record that he had been able to hear the testimony of the other witnesses. The trial court also permitted J.S.T.'s counsel to make phone calls to confer with him when requested.

The record demonstrates that J.S.T.'s own attorney requested that the trial court determine whether his appearance via video teleconferencing was necessary, and J.S.T. failed to object at any point to the trial court's decision to proceed in that manner. Thus, J.S.T. failed to preserve any complaint regarding his appearance through video teleconferencing for consideration on appeal. *See* TEX. R. APP. P. 33.1; *Sherry*, 46 S.W.3d at 861.

Moreover, we cannot conclude that the trial court abused its discretion in applying the standards set out in section 81.169(i). Dr. Guidry, the health authority, advised the court that J.S.T. "must remain in isolation or quarantine and that exposure to the judge, jurors, or the public would jeopardize the health and safety" of others in the court, and the judge allowed him to appear by video-teleconferencing, which allowed him "to speak, to interact with witnesses, and to confer with [his] attorney." *See* TEX. HEALTH & SAFETY CODE ANN. § 81.169(i).

We overrule J.S.T.'s second issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Massengale, and Lloyd.

18