**Opinion issued February 28, 2019**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-18-00454-CR**

———————————

**HUNG DASIAN TRUONG, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 339th District Court**
**Harris County, Texas**
**Trial Court Case No. 1172979**

---

## O P I N I O N

In 2008, appellant, Hung Dasian Truong, was charged with the second-degree felony offense of manslaughter. The following year, in 2009, the trial court found appellant not guilty by reason of insanity and signed an order committing him for

inpatient treatment. The trial court has renewed the inpatient commitment order for each of the following years. In this appeal, appellant challenges the trial court's May 10, 2018 recommitment order, contending that the State presented insufficient evidence to support the order renewing appellant's commitment for inpatient treatment.

We affirm.

## Background

On June 29, 2008, appellant drove through a traffic barricade at a high rate of speed and struck Houston Police Department Officers G. Gryder and F. Pylon. Officer Gryder died as a result of his injuries, and the State charged appellant with the offense of manslaughter. While appellant's criminal case was pending, the trial court ordered two psychologists to evaluate appellant for his competency to stand trial as well as his sanity at the time of the offense. During his interviews with the psychologists, which occurred approximately six months apart, appellant reported that he had been having auditory hallucinations for several years and that he had had hallucinations while he was driving home on the day of the incident. Appellant stated that he thought the "voices were from God or from the devil," that the voices were fighting, that the voices told him to run over the officers with his car, and that he "thought [Officer Gryder] was a demon" and "the arresting officers were angels."

2

Both psychologists concluded that, in their professional opinions, appellant suffered from schizophrenia and was legally insane at the time of the offense.

On December 17, 2009, the trial court found appellant not guilty of the charged offense by reason of insanity. In its judgment, the trial court found that the charged offense involved dangerous conduct that caused serious bodily injury to another person and that placed another person in imminent danger of serious bodily injury. The court ordered appellant committed to North Texas State Hospital for thirty days for evaluation. In January 2010, the trial court agreed with North Texas State Hospital's recommendations and found, by clear and convincing evidence, that appellant had a severe mental illness, that as a result of that illness appellant was likely to cause serious bodily injury or harm to another if he was not provided treatment and supervision, that appropriate treatment and supervision could not be safely or effectively provided on an outpatient basis, and that inpatient treatment was necessary to protect the safety of others. The trial court ordered appellant committed to North Texas State Hospital for inpatient treatment for 180 days. Appellant was later transferred to Rusk State Hospital.

The trial court renewed the commitment orders on an annual basis and ordered appellant recommitted to Rusk State Hospital for inpatient treatment each year from 2010 through 2018. The trial court's May 10, 2018 recommitment order is the subject of this appeal.

3

On April 5, 2018, the State requested that the trial court renew its order committing appellant for inpatient treatment. The State alleged that due to the severity of appellant's mental illness, he was "at a high risk for recurrence of symptoms if not actively in treatment" and that a renewed inpatient commitment order would "ensure the continuity of care and supervision that supports effective delivery of inpatient treatment."

On April 24, 2018, Dr. George Howland, appellant's treating psychiatrist at Rusk State Hospital, examined appellant and completed a statutorily-required "Physician's Certificate of Medical Examination for Mental Illness." Dr. Howland reported that appellant had been under his care for five years and seven months and that appellant had been diagnosed with schizoaffective disorder-bipolar type, alcohol abuse, and cocaine abuse. Dr. Howland opined that appellant was not likely to cause serious harm to himself, nor was he likely to cause serious harm to others. Dr. Howland stated, "[Appellant] has been stable with no manic episodes in 18 months. His meds have not been changed recently. He participates in classes and follows unit rules." Appellant reported, "My meds are good," "I'm ready to go, I think," "I'm doing well," and he reported that he was not having any manic symptoms.

Dr. Howland also completed a "Forensic Psychiatry Report to Court-NGRI Acquittee." Under a heading entitled "Recent course in the hospital" Dr. Howland stated:

[Appellant] follows the rules and gets along with others on the unit. He knows he needs to take his meds to stay well. He has good insight into his mental illness. He has a client worker job that he does well. He has not been aggressive to himself or others. He has taken his medication with no problem. He does self-administration of his meds with nursing supervision. [Appellant] has done well for 16 months with no signs of mania. He has not been psychotic over this period.

Dr. Howland stated that, in the opinion of the Hope Unit Recovery Team, appellant was ready for discharge from inpatient treatment at Rusk State Hospital because his mood had been stable for sixteen months, he had not been aggressive, and he had been compliant with treatment.

The trial court held a hearing on the State's motion to renew appellant's inpatient commitment on May 9, 2018. At the hearing, Dr. Howland testified that he had been appellant's treating psychiatrist at Rusk State Hospital since March 2012. Appellant's medications included a mood stabilizer and an antipsychotic drug. Dr. Howland testified that if appellant stopped taking his mood stabilizer, his manic symptoms could return, he could experience pressured speech, and he could become hypersexual and aggressive. He also stated that appellant took antipsychotic medication to help with psychotic symptoms, including "voices, disorganized thoughts, [and] delusional thoughts." Dr. Howland stated that appellant "needs to stay on his medicine like all psychiatric patients do" to avoid the recurrence of his symptoms.

5

Dr. Howland testified that in September 2016, nearly two years before the hearing, appellant approached Dr. Howland, spoke with pressured speech, and told Dr. Howland that he did not want to take his antipsychotic medication because he felt that it was making him urinate too much. Dr. Howland and appellant discussed the issue, and appellant ultimately agreed to take all of his medications. Dr. Howland testified that he believed it was good that appellant spoke to him about his concerns. He also testified that, at that time, he increased the dosage of appellant's mood stabilizer and, since that time, appellant had done "really well," with no manic or psychotic symptoms.

Dr. Howland also testified concerning appellant's administration of his medication at Rusk. Appellant self-administered his medication under the supervision of a nurse. Appellant's medications were kept locked up at the nurses' station, and he would approach the station at the scheduled time and take his medication after a nurse verified that he was taking the correct medication. When the State asked Dr. Howland if appellant would need "this type of self-administration" if he were placed in outpatient care, Dr. Howland testified:

> Well, I think in the community it will be a lower level of care. I think he knows his meds, and I think he could take his meds on his own; but depending on what the requirements are of the Court, if they want him to be dispensed his meds, he's fine with that. I have confidence in him; because if you talk with him and you ask him, he knows his meds. He knows when he takes them. He knows why he's taking them. He's very good with his meds. So, whatever the Court deemed—you know, whatever they were happy with would be fine with me.

6

Dr. Howland stated that he believed appellant was "stable on his meds" and that appellant should be able to work if he were placed on an outpatient treatment plan and the court allowed him to have a job. He also stated that he did not believe that appellant was likely to cause serious harm to himself or to others. He did not believe that further inpatient treatment was necessary. He stated, "If he stays on his meds and makes his appointments and follows what the Court says in the community, I think he'll do fine."

Dr. Sarah Rogers conducted a dangerousness risk assessment on appellant that involved a review of patient records, the evaluation of risk factors, and a clinical interview. She agreed with the State that appellant reported he had started having auditory hallucinations as a young adult and that he was having hallucinations on the night of the offense. She also agreed that appellant reported that he had started using alcohol, cocaine, and ecstasy, and she agreed that appellant's substance abuse likely exacerbated his auditory hallucinations. Dr. Rogers opined that appellant had been "very engaged and involved" with his treatment at Rusk State Hospital and that appellant had good insight into his mental illness. She testified:

> [B]ecause people oftentimes are not diagnosed [with a mental illness], and a tragedy happens. They get treatment. They get the correct medication. They get insight. Just as my risk assessment shows, [appellant] has gained insight, you know, and learned that he does have a mental illness. He needs to take medication. He needs to stay away from substances. And so, that's why we were able to give him an estimate of low risk. You know, we are looking at his functioning in the

7

community, his risk for future violence; and he came out to be low risk. Not everybody is low risk. Some people are moderate or high risk, but [appellant] is low risk . . . .

She opined that appellant had the ability to participate in outpatient treatment, given that he resided on the least restrictive unit at Rusk State Hospital and self-administered his medication, and she agreed with Dr. Howland that outpatient treatment was appropriate for appellant.

Theresa Allen has been appellant's social worker at Rusk State Hospital since March 2013. She testified that in October 2017, appellant—accompanied by three members of Rusk staff—went on a court-approved visit to a local McDonald's to meet his sister and father and that the outing "went well, and he returned to the [Rusk] campus without any difficulties." She stated that appellant participated in several classes and extracurricular activities at Rusk and participated in overnight camp-outs that occurred on Rusk property. She testified that appellant has never been aggressive while at Rusk. She described appellant as a model patient who followed all rules and guidelines and interacted well with staff and other patients. She stated that appellant had informed her that he would follow all guidelines set by the court if he were placed in outpatient treatment. She also stated that the Hope Unit, where appellant resides, is an "open" unit designed to prepare patients for outpatient treatment, that it is not fenced in, and that appellant has never eloped from the facility since he arrived in 2010.

Dr. David Bobb testified that he is a psychiatrist for the Harris Center—Harris County's mental health authority—and that he evaluated appellant to determine if he were fit to be released for outpatient treatment. He stated that he would be appellant's treating psychiatrist if appellant were placed in outpatient treatment, which he believed was appropriate. Dr. Bobb agreed that, after leaving Rusk, appellant would not have twenty-four hour direct access to a psychiatrist, but he would be provided with the phone number for twenty-four hour Harris Center help line if he started experiencing symptoms or decompensating after hours. Dr. Bobb testified that, under the system used by the Harris Center, he could see appellant "as frequently as needed based on his presentation" and appellant did not have to report to Dr. Bobb's office; instead, a clinician would bring appellant to Dr. Bobb.

Dr. Bobb reviewed appellant's medical records—in which appellant admitted to abusing alcohol, cocaine, marijuana, and ecstasy—and he categorized appellant's substance abuse history as "extensive." He stated that if, upon release from Rusk, appellant began abusing drugs again, "that would increase his risk of having hallucinations, having psychiatric instability," but Dr. Bobb stated that he could not determine if appellant would necessarily become violent or reoffend.

The State discussed with Dr. Bobb various treatment plans for appellant that had been formulated among personnel at Rusk, the Harris Center, and other agencies that assisted patients newly released to outpatient treatment. The first plan,

developed by Rusk State Hospital's recovery team, stated that appellant "has demonstrated he can successfully live in a residential setting and outpatient setting with medication monitoring" and recommended that appellant live at an assisted living facility where his "psychiatric condition, medication and outpatient recovery compliance can be monitored." This plan named the Divine Heritage Assisted Living facility on Longbrook Drive in Houston as the recommended assisted living facility for appellant. On May 3, 2018, the Harris Center completed a revised "State Hospital Forensic Aftercare Recommendations" form that recommended the Divine Heritage Assisted Living facility on Hornbrook Drive in Houston as the proposed placement for appellant. Dr. Bobb testified that he found out on the morning of the hearing— May 9, 2018—that the recommended outpatient placement for appellant had been changed once again, but he did not know the details of why that change had occurred. He agreed with the State that appellant's "placement in the community is important."

Dr. Bobb also testified concerning the development of an outpatient treatment plan:

> [T]hroughout the interview [with appellant], [the Harris Center's intake coordinator] listened to the things that were going to be pertinent to [appellant's] outpatient treatment plan. And these are pretty much standardized for most clients to be tweaked as the clients come in. We talked about medications. We talked about housing. We talked about drug screening. We talked about all those things that identified as potential risk factors that would increase [appellant's] chances of decompensation.

10

Dr. Bobb testified that substance abuse is a risk factor that is weighted a little more heavily, but living environment, history of medication compliance,[1] and family support are also risk factors. He stated, "All of those play a role in helping to reduce—when addressed correctly, reduce a client's risk." He testified that the designation of a licensed personal care facility is important "so that we can ensure that [the patient is] put in a licensed care home that is staffed by people who help us monitor his medication management."

Dr. Trina Burkes-Jones, an investigator for the Mental Health Division of the Harris County District Attorney's Office, testified that she conducts evaluations of living facilities for not-guilty-by-reason-of-insanity acquittees being released from inpatient care. She testified that she conducts these evaluations for the safety of the general public and because the trial court must approve the particular residence.

Burkes-Jones evaluated two assisted living facilities that had been recommended for appellant, both of which were owned and operated by the same person, Justina Uzowulu. The facility on Longbrook was the first one recommended

---

[1] Dr. Bobb testified that, in his interview with appellant, which occurred in April 2018, he repeatedly talked about what had happened in September 2016 when appellant did not want to take his antipsychotic medication due to one of the side effects "because I needed him to make sure if he's having side effects, which is the number one reason why people stop taking their psychiatric medication, that he feel comfortable to be able to talk with me." Dr. Bobb stated, "And it seems like from that episode [in September 2016], [appellant] had learned the importance of medication compliance."

11

as a placement for appellant, and Burkes-Jones described it as a single-family residence with a converted garage that was licensed for eleven residents. When Burkes-Jones arrived at the Longbrook facility, she observed Uzowulu in her car, backing out of the driveway. Burkes-Jones and Uzowulu spoke, and Uzowulu agreed to let Burkes-Jones look around. Burkes-Jones testified that the Longbrook facility was "filthy," with rotted and fermented food in the kitchen and an open biohazard bag on top of the refrigerator. No administrative staff other than Uzowulu worked at this facility, and Uzowulu's staffing logs indicated that she worked twenty-four hours per day at both the Longbrook and the Hornbrook facilities.

While Burkes-Jones was visiting the Longbrook facility, a large tree in the front yard of the house fell. The door to the office of this facility, which was where medications were stored, was unlocked. Burkes-Jones described the office as disorganized, stating that the residents' medications were mixed together, some medications were loose and not stored in bottles, some medications were not labeled, some medications were clearly old and not recent, some medications were on the floor, and Burkes-Jones could not tell which medications belonged to which residents.[2] Uzowulu told Burkes-Jones that she was the only one who administered medications and she did not allow residents to self-administer their medications.

---

[2]     Uzowulu told Burkes-Jones, "[I]f [the residents] take their medicine, they take it. If they don't, they don't."

Burkes-Jones visited the facility on April 17, and a medications log had no information entered after April 15. An open folder containing the residents' personal information was lying on the floor of the office. The only locked portion of the facility was a drawer in the office that held cigarettes Uzowulu would give to the residents.

Burkes-Jones visited the Hornbrook facility, also owned and operated by Uzowulu, on May 8, 2018. This facility was also a single-family residence, but without a converted garage, and was licensed for nine residents. Uzowulu was not present when Burkes-Jones arrived, but she arrived within minutes after Burkes-Jones called her. No other staff was present. As far as the cleanliness of this facility, Burkes-Jones testified:

> I can tell that [Uzowulu] knew that I was coming because it was clean. She told me, I cleaned up before you came because I was expecting you the day before. But when it came to the medications, it was almost the same [as the Longbrook facility].

Burkes-Jones testified that, at the Hornbrook facility, the residents' medications were stored behind a door that Uzowulu attempted to keep closed with a clothes hanger. Burkes-Jones agreed with the State that the medicine cabinet "look[ed] about the same" as the one at the Longbrook facility.

Burkes-Jones testified that, as with Longbrook facility, Uzowulu was unable to tell which medications belonged to which residents. Uzowulu did not keep a medication log at this facility, nor did she keep any kind of record that tracked

13

whether the residents were experiencing symptoms, whether the residents were attending therapy sessions, or whether the residents were improving. When asked how residents were able to get help if they had any problems, Burkes-Jones testified: "[Uzowulu] stated that she uses the 911 system as a way to help control her people, because she's the only one there and she has mostly males in both facilities."

Burkes-Jones also testified concerning the treatment that residents received at Uzowulu's facilities:

> One of the questions that I ask when I go is where they—where are they [the residents] receiving their treatment from? Who's providing their treatment? How are they getting their therapeutic care past the hospital to maintain their continuum of care? When I asked [Uzowulu] about that [at] the first meeting that we had [at the Longbrook facility], she could not give me a location of who was doing her treatment. Because her clients [the residents] are allowed to leave at will to come and go as they please, she has no stipulations on how they go, where they go or who they go with, as long as they are back in the home by 7:00 o'clock. So that, in itself, let me know that she was not using a day program.

> On our second meeting I had to sit her down and tell her, look, with the clients coming from the State hospital, we have to know who is providing their care; and she wasn't truthful with me. So, she started— I asked her, give me a name. Give me a telephone number. I need a contact person. She could not provide those, anything. So, she threw out a name, I think Roland something. I asked her where was it. She told me it was downtown in the medical center. What was the address?

> So, she went through her phone; and she said that it was at 8300 Homestead. And I told her, okay. So, I didn't press her anymore about the facility. And I asked her, well, what kind of treatment are they receiving? Well, I bus them there and drop them off; and I told her okay.

Burkes-Jones then immediately left the Hornbrook facility and drove to the location on Homestead. Burkes-Jones's first impression of the Homestead location was that

14

it was abandoned: the location was "junked" and "rotted," there were broken windows that had been replaced by plywood, and the building did not look like it was occupied. The trial court admitted photographs of the Longbrook facility, the Hornbrook facility, and the Homestead location.

Burkes-Jones also testified that, at the time of the hearing, Uzowulu had a case pending in federal court concerning her alleged receipt of around $800,000 in kickbacks related to transportation and care of clients under Medicaid. Burkes-Jones further testified that one of the residents of the Hornbrook facility "overseas the home like a house boss" and that this resident had a criminal history that included several aggravated assault on a police officer cases, several resisting arrest cases, and a case concerning the manufacturing and delivery of a controlled substance.

Appellant also testified at the hearing. He testified that, since being placed on his current medication, his mood was stable and he had not had any auditory hallucinations. He stated that he was comfortable speaking to Dr. Howland about any symptoms and that he had met Dr. Bobb and felt comfortable speaking with him as well. He testified that it was important to tell his doctors if he started having symptoms again so they could adjust his medication. He also testified that he knows which medications he is supposed to take, the dosage, and the reason for his medications and that, at Rusk, he selects the medications he needs while a nurse watches.

15

Appellant also testified that, if he is released for outpatient treatment, it would be important for him to follow all rules and guidelines imposed by his doctors and by the court because otherwise he might be returned to inpatient care. He stated that he realized that, if he stopped taking his medication, he could become likely to cause serious bodily injury to another person. He stated that he did not believe that he still needed inpatient commitment because he "got treatment, and [he is] stabilized."

At the close of the hearing, the trial court stated:

> Based on the evidence and testimony, the Court finds that you are doing well at the mental health hospital, Mr. Truong, where they monitor your medication. If you missed any of your medication, you could be a danger to yourself, as well as the community.
>
> Therefore, pursuant to Chapter 46(c) of the Texas Code of Criminal Procedure, the Court hereby finds from clear and convincing evidence that the patient has a severe mental illness. And as a result of that mental illness, the patient is likely to cause serious bodily injury or serious harm to another if the patient is not provided treatment and supervision. Appropriate treatment and supervision for the patient's mental illness cannot be safely or effectively provided as outpatient or community-based treatment and supervision, and inpatient treatment or residential care is necessary to protect the safety of others.
>
> And, therefore, the Court orders the patient committed to Rusk State Hospital for one year from this date of this order.

The trial court signed a written order memorializing these findings. This appeal followed.

16

**Sufficiency of the Evidence**

In his sole issue on appeal, appellant contends that the State failed to present sufficient evidence to support the trial court's May 10, 2018 order renewing his inpatient commitment at Rusk State Hospital. Specifically, appellant argues that the State failed to prove that treatment and supervision for his mental illness could not be safely and effectively provided as outpatient treatment and that, as a result, inpatient treatment was necessary to protect the safety of others.

**A.    *Standard of Review***

When the burden of proof is heightened to a clear-and-convincing standard, as is the case for commitment proceedings following a finding of not guilty by reason of insanity, the sufficiency of evidence standards of review are also heightened. *House v. State*, 261 S.W.3d 244, 247 (Tex. App.—Houston [14th Dist.] 2008, no pet.). In conducting a legal sufficiency review when the burden of proof is clear and convincing evidence, we must consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction as to the truth of the allegations sought to be established. *Id.*; *see Rodriquez v. State*, 525 S.W.3d 734, 739 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("While the proof required under [the clear and convincing evidence] standard must weigh more heavily than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.").

We resolve disputed fact questions in favor of the finding if a reasonable factfinder could have done so, and we disregard all contrary evidence unless a reasonable factfinder could not. *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010). We must avoid substituting our own judgment for that of the factfinder. *House*, 261 S.W.3d at 247.

## B. *Commitment Proceedings for Acquitted Persons*

Code of Criminal Procedure Chapter 46C, which applies to offenses committed after September 1, 2005, governs the raising of the insanity defense, the determination of a defendant's sanity, and the disposition of a defendant after a finding of not guilty by reason of insanity. If a defendant is found not guilty by reason of insanity ("an acquitted person"), the trial court shall determine whether the charged offense involved conduct that (1) caused serious bodily injury to another person, (2) placed another person in imminent danger of serious bodily injury, or (3) consisted of a threat of serious bodily injury to another person through the use of a deadly weapon. TEX. CODE CRIM. PROC. ANN. art. 46C.157. If the court determines that the offense involved conduct that caused serious bodily injury to another person, the court retains jurisdiction over the acquitted person until either the court discharges the person and terminates its jurisdiction or the cumulative total period of institutionalization and outpatient or community-based treatment and supervision equals the maximum term provided by law for the offense of which the person was acquitted by reason of insanity. *Id.* art. 46C.158.

18

In situations in which the court makes a finding that the offense involved dangerous conduct, the court shall order the acquitted person to be committed for a period not to exceed thirty days in order to evaluate the person's present mental condition and to determine the "proper disposition of the acquitted person," for example, whether inpatient treatment is necessary or whether outpatient treatment is appropriate. *Id.* art. 46C.251(a), (d). The trial court must hold a disposition hearing within thirty days of acquittal. *Id.* art. 46C.251(d). At the hearing, the court must address (1) whether the acquitted person has a severe mental illness or mental retardation; (2) whether as a result of any mental illness or mental retardation the person is likely to cause serious harm to another; and (3) whether appropriate treatment and supervision can be safely and effectively provided as outpatient or community-based treatment and supervision. *Id.* art. 46C.253(b).

The trial court shall order the acquitted person committed to a mental hospital for inpatient treatment or residential care if the State establishes by clear and convincing evidence that:

(1)    the person has a severe mental illness or mental retardation;

(2)    the person, as a result of that mental illness or mental retardation, is likely to cause serious bodily injury to another if the person is not provided with treatment and supervision; and

(3)    inpatient treatment or residential care is necessary to protect the safety of others.

*Id.* art. 46C.256(a). In determining whether the State has proved that inpatient treatment is necessary, the court shall consider whether the evidence shows both that (1) an adequate regimen of outpatient or community-based treatment will be available to the acquitted person; and (2) the person will follow that regimen. *Id.* art. 46C.256(b). An order for commitment to inpatient treatment expires on the 181st day after the date the order is issued, but it is subject to renewal as provided by statute. *Id.* art. 46C.256(c).

A trial court that orders an acquitted person committed to inpatient treatment shall determine on an annual basis whether to renew the order. *Id.* art. 46C.261(a). At least thirty days before the order is scheduled to expire, the institution to which the acquitted person is committed or the State may request that the commitment order be renewed. *Id.* art. 46C.261(b). The request must explain in detail why renewal is being requested and why outpatient or community-based treatment and supervision is not appropriate. *Id.* The court "shall renew the order only if the court finds that the party who requested the renewal has established by clear and convincing evidence that continued mandatory supervision and treatment are appropriate." *Id.* art. 46C.261(h). The court may modify the order to provide for outpatient treatment "if the court finds the acquitted person has established by a preponderance of the evidence that treatment and supervision can be safely and effectively provided as outpatient or community-based treatment and supervision."

*Id.* art. 46C.261(i). A renewed order authorizes inpatient or outpatient treatment for not more than one year. *Id.* art. 46C.261(h).

The trial court may order an acquitted person to participate in outpatient treatment on renewal of a commitment order under article 46C.261. *Id.* art. 46C.263(a). The court may order the acquitted person to participate in outpatient treatment only if (1) the court receives and approves an outpatient treatment plan that comprehensively provides for the outpatient treatment and supervision, and (2) the court finds that the outpatient treatment provided for by the plan will be available and provided to the acquitted person. *Id.* art. 46C.263(b). If the trial court signs an order requiring the acquitted person to participate in outpatient treatment, the order "must identify the person responsible for administering an ordered regimen of outpatient or community-based treatment and supervision." *Id.* art. 46C.263(f). "In determining whether an acquitted person should be ordered to receive outpatient or community-based treatment and supervision rather than inpatient care or residential treatment, the court shall have as its primary concern the protection of society." *Id.* art. 46C.263(g).

An acquitted person may appeal from an order renewing inpatient commitment entered under article 46C.261. *Id.* art. 46C.270(b)(3).

*C.*     *Analysis*

In arguing that the trial court properly renewed appellant's inpatient commitment order for another year, the State contends that it was not required to demonstrate by clear and convincing evidence that appellant was likely to cause serious harm to others; instead, it argues that it only needed to establish by clear and convincing evidence that "continued mandatory supervision and treatment are appropriate."

Code of Criminal Procedure Article 46C, Subchapter F—entitled "Disposition Following Acquittal By Reason of Insanity: Finding of Dangerous Conduct"—sets out the procedures for evaluating and committing an acquitted person after, as in this case, the trial court has made a finding that the charged offense involved dangerous conduct. *See id.* arts. 46C.251–.270. Article 46C.261, which governs the renewal of orders for inpatient commitment, specifically details the procedures that a trial court is to follow in determining whether to renew a commitment order for another year. *See id.* art. 46C.261. Subsection (h) provides, "A court shall renew the order only if the court finds that the party who requested the renewal has established by clear and convincing evidence that continued mandatory supervision and treatment are appropriate." *Id.* art. 46C.261(h). This particular statute does not provide any criteria for determining whether continued inpatient supervision and treatment are appropriate.

22

Other articles in Subchapter F, however, do provide criteria for the trial court to consider when determining whether inpatient commitment is appropriate. Article 46C.253, governing the trial court's "hearing on disposition" following the initial thirty-day commitment after the court enters a judgment of acquittal, provides that the court shall address (1) whether the acquitted person has a severe mental illness or mental retardation; (2) whether as a result of any mental illness or mental retardation, the person is likely to cause serious harm to another; and (3) whether appropriate treatment and supervision for any mental illness or mental retardation rendering the person dangerous to another can be safely and effectively provided as outpatient or community-based treatment and supervision. *Id.* art. 46C.253(b).

Article 46C.256 sets out the requirements for committing an acquitted person for inpatient treatment and provides that the court shall order inpatient commitment if the State establishes by clear and convincing evidence that (1) the person has a severe mental illness or mental retardation; (2) as a result of that mental illness or mental retardation, the person is likely to cause serious bodily injury to another if not provided with treatment and supervision; and (3) inpatient treatment or residential care is necessary to protect the safety of others. *Id.* art. 46C.256(a); *see id.* art. 46C.253(c) ("The court shall order the acquitted person committed for inpatient treatment or residential care under Article 46C.256 if the grounds required for that order are established."). In determining whether inpatient treatment is

necessary, the court shall consider whether the evidence shows that an adequate regiment of outpatient treatment will be available to the person and the person will follow that regimen. *Id.* art. 46C.256(b).

We disagree with the State's contention that it was not required to establish that appellant was likely to cause serious harm to others. In determining whether continued inpatient treatment is "appropriate" in the context of renewing an inpatient commitment order, the trial court must necessarily consider whether the acquitted person continues to meet the requirements for inpatient treatment as set out in Articles 46C.253 and 46C.256. Indeed, that is what the trial court in this case did at the hearing and in its May 10, 2018 commitment order. The trial court specifically found, by clear and convincing evidence, that appellant had a severe mental illness, that as a result of that illness appellant was likely to cause serious bodily injury or harm to another if not provided treatment and supervision, that appropriate treatment and supervision could not be safely or effectively provided as outpatient or community-based treatment and supervision, and that inpatient treatment was necessary to protect the safety of others. In making its findings, the trial court thus considered the criteria for inpatient treatment set out in Article 46C.253 and 46C.256. We therefore turn to whether the trial court's findings are supported by clear and convincing evidence.

Appellant does not dispute that he has a severe mental illness, that he needs treatment for his mental illness, and that, if left untreated, his mental illness may result in serious harm to others. He argues, however, that the evidence presented at the hearing does not support the trial court's finding that inpatient treatment is necessary to protect the safety of others; instead, the evidence demonstrated that appropriate treatment for his mental illness can be safely and effectively provided as outpatient or community-based treatment. He further argues that the State's focus during the recommitment hearing on the quality of the housing in which he would live after release is misplaced because "[h]ousing is not treatment" and the trial court should not have considered housing at all in making its determination. We disagree.

The State presented evidence that appellant has been diagnosed with schizoaffective disorder-bipolar type, as well as alcohol and cocaine abuse. Appellant has a history of abusing drugs—including alcohol, cocaine, marijuana, and ecstasy—and the State presented evidence that his substance abuse likely exacerbated the auditory hallucinations that he had experienced, leading to the incident that resulted in the death of Officer Gryder. Both Dr. Howland and Dr. Bobb emphasized the importance of appellant remaining on his regimen of psychoactive medication, which includes a mood stabilizer and an antipsychotic, the importance of appellant addressing any concerns that he has with his medications and their side effects with his psychiatrist instead of unilaterally deciding to cease taking his

medications, and the importance of appellant avoiding the use of illegal substances. The doctors agreed that appellant's mental illness needed lifelong treatment and that his continued use of psychoactive medication was of paramount importance in keeping his manic and psychotic symptoms at bay.

The State also presented evidence that Rusk State Hospital and the Harris Center had worked with outside agencies in developing a treatment plan for appellant should he be released to outpatient care. The Rusk recovery team recommended "an assisted living facility where Mr. Truong's psychiatric condition, medication and outpatient recovery compliance can be monitored." The recovery team first recommended the Longbrook facility for appellant, but several days before the recommitment hearing, the recommendation changed to the Hornbrook facility. By the time of the hearing, the Hornbrook facility was no longer recommended, and the Harris Center was searching for an appropriate assisted living placement for appellant. Thus, there was no specific recommendation for an assisted living placement at the time of the hearing.

The record contains extensive evidence demonstrating the inappropriateness of both the Longbrook and the Hornbrook facilities for appellant. Aside from the filthy living conditions of the Longbrook facility, both facilities lacked staff to care for the residents, with Uzowulu as the only staff member, apparently assisted at the Hornbrook facility by a resident, a man with a lengthy criminal history including a

drug-related case. The record reflects that Uzowulu's system for keeping track of her residents' medications was incoherent, that the medications were not secured, and that her medication logs either were not up-to-date (at the Longbrook facility) or were nonexistent (at the Hornbrook facility). Uzowulu had no records of where her residents attended treatment, and she provided no actual supervision of her residents, allowing them to leave the facilities freely and dropping them off at an abandoned building, supposedly for treatment. Her method of helping her residents if they had a problem was "us[ing] the 911 system as a way to help her control her people." She told Burkes-Jones, the investigator for the Harris County District Attorney's Office, that "if [the residents] take their medicine, they take it. If they don't, they don't."

The facilities owned and operated by Uzowulu were not recommended for appellant at the time of the recommitment hearing, but no specific replacement had been found. Appellant argues that "[h]ousing is not treatment" and that the trial court should not have considered the adequacy of housing recommendations in making its decision. We do not agree that housing and the particular location where appellant would be living is irrelevant to his treatment and supervision. Dr. Bobb testified that housing and living environment—along with medications, drug screening, and family support—are risk factors that could increase appellant's chances of decompensating and experiencing symptoms again. Dr. Bobb also testified that the

designation of a licensed personal care facility is important "so that we can ensure that [the patient is] put in a licensed care home that is staffed by people who help us monitor his medication management." Where appellant lives, and the care that he receives while there, is, like his medication compliance and his visits to his psychiatrist, an important component of his treatment, and these factors were properly considered by the trial court.

In determining whether inpatient care has been proved necessary to protect the safety of others, the trial court must consider whether the evidence shows both that (1) an adequate regimen of outpatient or community-based treatment will be available to the acquitted person, and (2) the person will follow that regimen. TEX. CODE CRIM. PROC. ANN. art. 46C.256(b); *see also id.* art. 46C.263(g) ("In determining whether an acquitted person should be ordered to receive outpatient or community-based treatment and supervision rather than inpatient care or residential treatment, the court shall have as its primary concern the protection of society."). Dr. Howland, Dr. Rogers, and Dr. Bobb all testified that they believed outpatient treatment was appropriate for appellant and that he could succeed in such a program. Dr. Bobb testified that he would be appellant's treating psychiatrist if appellant were released, and he stated that appellant would have access to him, clinicians that worked with him, and the Harris Center's after-hours help line if appellant needed assistance outside of Dr. Bobb's office hours. Appellant testified that he knew the

28

importance of taking his prescribed medications, that he felt comfortable speaking to Dr. Bobb about his medications and any concerns with those medications, and that he would follow any rules or guidelines imposed on him by his doctors or by the court.

Although there was evidence that appellant would, if released from inpatient treatment, be under the care of a psychiatrist, and that appellant would follow that psychiatrist's instructions, there was no evidence presented that appellant would reside in an appropriate assisted living facility that would provide supervision and monitoring of his medication, a crucial aspect of appellant's treatment. Under this record, we conclude that the trial court could have formed a firm belief or conviction that an adequate regimen of outpatient or community-based treatment was not available to appellant and, therefore, that inpatient treatment or residential care was necessary to protect the safety of others. *See id.* art. 46C.256(a)(3), (b); *House*, 261 S.W.3d at 247 (requiring appellate court to consider all evidence in light most favorable to finding to determine whether reasonable factfinder could have formed firm belief or conviction as to truth of allegations sought to be established). We therefore hold that sufficient evidence supports the trial court's conclusion that continued inpatient supervision and treatment are appropriate for appellant. *See* TEX. CODE CRIM. PROC. ANN. art. 46C.261(h).

We overrule appellant's sole issue.

## Conclusion

We affirm the trial court's May 10, 2018 recommitment order.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Publish.  TEX. R. APP. P. 47.2(b).