

NUMBER 13-21-00357-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE ARNOLD RAUL GONZALES

**On appeal from the 377th District Court
of Victoria County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria
Memorandum Opinion by Justice Benavides**

In a single issue, appellant Arnold Raul Gonzales argues that the evidence is factually insufficient to support the trial court's amended order committing him to an inpatient mental health treatment facility. *See* TEX. CODE CRIM. PROC. ANN. art. 46C.256. We affirm.

### I.    BACKGROUND

On May 18, 2020, Gonzales attacked his then–82-year-old neighbor and was charged with injury to an elderly individual, a first-degree felony. *See* TEX. PENAL CODE

ANN. § 22.04. Two different experts were appointed to evaluate whether Gonzales was sane at the time of the attack. One expert was unable to reach a conclusion as to Gonzales's sanity, but the second expert concluded that Gonzales was insane at the time of the incident. On July 28, 2021, Gonzales entered a plea of not guilty by reason of insanity to the offense of injury to an elderly individual. The trial court found that Gonzales was not guilty by reason of insanity and ordered an initial temporary commitment for a period not to exceed thirty days and a mental health evaluation. *See* TEX. CODE CRIM. PROC. ANN. arts. 46C.251, 46C.252. On August 26, 2021, Gonzales was admitted to San Antonio State Hospital (SASH) for the temporary commitment and evaluation period.

On September 22, 2021, counsel for Gonzales filed a copy of SASH's evaluation report, which included a letter from Gonzales's attending psychiatrist, a dangerousness risk evaluation, and treatment recommendations. The trial court held a hearing on October 14, 2021.[1] During the hearing, the trial court took judicial notice of the court's file, including the contents within. At the conclusion of the hearing, the trial court found

> by clear and convincing evidence that Arnold Raul Gonzales has a severe mental illness or mental retardation, that Arnold Raul Gonzales, as a result of the mental illness or mental retardation, is likely to cause serious bodily injury to another person if he's not provided the [sic] treatment and supervision and that inpatient treatment or residential care is necessary for the protection and safety of others.

The trial court signed an amended order committing Gonzales that reiterated these

---

[1] Gonzales characterizes this hearing as a renewal hearing. *See* TEX. CODE CRIM. PROC. ANN. art. 46C.261. The State characterizes this hearing as a disposition hearing. *See id.* art. 46C.253. We agree with the State's characterization. The record indicates the trial court had not conducted a disposition hearing prior to the October 14 hearing, and its amended order only required Gonzales to be committed inpatient for an additional 180 days, *see id.* art. 46C.256(c), rather than a full year. *See id.* art. 46C.261(h). Regardless, the findings required for renewing an order of inpatient commitment are the same as the findings required to initially order an acquitted person to inpatient commitment. *See id.* arts. 46C.256(a), 46C.261(h).

findings and extended appellant's inpatient treatment for an additional 180 days. This appeal followed. *See id.* art. 46C.270(b)(1).

## A.      Dangerousness Risk Evaluation

Dr. Heather Holder, a forensic psychologist with SASH, conducted the dangerousness risk evaluation of Gonzales included in SASH's evaluation report. The sources of information used for determining Gonzales's level of risk were: (1) a "[c]linical interview with Arnold Gonzales (120 minutes)"; and (2) "[c]ourt and mental health records, May 2020-[September 1, 2021]." In the evaluation, Dr. Holder's diagnostic impressions of Gonzales are listed as "[s]chizoaffective disorder, bipolar type" and "[a]mphetamine use disorder, moderate, in early full remission."

The evaluation included a summary of the events leading up to the underlying incident. According to Gonzales, his mental health issues began "around age 29 or 30." His symptoms first presented as "hear[ing] people saying things when they weren't." In March 2013, Gonzales completed a diagnostic assessment with Gulf Bend Center, the local mental health authority for Victoria County, where he told staff that "he felt there is an alternative reality, that he hears voices, that people are imposters and do not look like they are human, and felt that the atmosphere was violent."

Around the fall of 2019, Gonzales again presented to Gulf Bend Center as "paranoid" and having "disorganized speech . . . suggesting he may have stopped medication at that time." In January 2020, an order of emergency detention was issued "after he reported that a neighbor had underground tunnels with satellites invading his house." In February 2020, "he was found standing 'naked at a middle school with roller

blades.'" He tested positive for methamphetamines at that time. In April 2020, Gonzales attacked his father, leading his father to contact Gulf Bend Center "warning them that [Gonzales] may be a danger to others." Finally, on May 18, 2020, Gonzales attacked his elderly neighbor "for no apparent reason," and was arrested. During this period of time, the evaluation states Gonzales had been living "in his parents' old house, down the street from the one in which they now live."

Gonzales was initially admitted to SASH for competency restoration during the pendency of his criminal case on October 20, 2020. The initial competency report indicated that Gonzales had "disorganized thought processes, made nonsensical statements, and exhibited rapid speech throughout the interview, leading the interviewer to have difficulty asking him questions." Gonzales "continued to present in this manner in the brief period after admission to SASH." "Specifically . . . [he] was condescending, threatening[,] and belligerent with staff when they tried to speak to him." "[D]ue to concerns that his aggressive behavior could escalate, a hearing for court ordered medication was initiated" and "within 1-2 weeks of being on medication, Mr. Gonzales presented as calmer and more rational, and he was able to attain competency very quickly, about 6 weeks after he was admitted." The record indicates Gonzales was returned to jail on January 5, 2021.

Gonzales reported that "after he was returned to jail from SASH and deemed restored, he initially heard auditory hallucinations 'a few times in jail,' but they then 'went away' and have not returned." After Gonzales was found not guilty by reason of insanity, he was readmitted to SASH on August 26, 2021. According to the dangerousness risk

4

evaluation, during this second admission, "[Gonzales] continued to present as calm, polite[,] and rational. Records indicate he has consistently presented this way to staff and states he is no longer experiencing any symptoms of mental illness, including hallucinations or delusional thought content."

The dangerousness risk evaluation appraised Gonzales's level of risk for aggression as low. However, because of Gonzales's historical risk factors, namely, "major mental illness; history of problems with treatment adherence; history of violence; history of substance use, and some problematic employment history," the evaluation opined that "intensive ongoing monitoring and treatment will be key to avoiding future violence." Dr. Holder recommended that Gonzales receive, among other things, "court supervised outpatient commitment for the foreseeable future."

## B.    Treatment Recommendations

SASH also set forth treatment recommendations. *See* TEX. CODE CRIM. PROC. ANN. art. 46C.252(c)(4). Gonzales's treatment team recommended he

> receive regular appointments with [a] psychiatrist monthly, intensive case management until well established with treatment providers and fully engaged in community programming with specifically identified daily routines, individual therapy in the community on a weekly basis initially, abstinence from substance and alcohol use with AA attendance and/or weekly counseling with a License Chemical Dependency Counselor (LCDC).

According to the treatment recommendations, outpatient treatment and supervision would be provided by Gulf Bend Center. The treatment recommendations included a plan for "Gulf Bend Center's psychiatrist [to] examine Mr. Gonzales within 15 days of his discharge from [SASH]" and that Gonzales "will have his intake appointment

5

within 72 hours of discharge from [SASH]." Although Gulf Bend Center does not have a "46C aftercare program," two of the "intensive case management" options provided by Gulf Bend Center were mentioned as possible modalities of care for Gonzales.

The treatment plan also included a section on substance abuse. According to the plan,

> Mr. Gonzales has identified self-help sobriety groups AA or NA as important to his ongoing recovery. . . . Gulf Bend Center offers substance abuse counseling. They also offer a peer support group called Relationships offered every Wednesday from 12:00pm to 1:00pm. Billy T. Cattan Recovery Outreach offer[s] substance abuse support groups as well as individual counseling. . . . An intake appointment will need to be scheduled.
>
> . . .
>
> The treatment team is recommending Mr. Gonzales be court ordered to have bi-monthly drug screenings for at least the first 6 months. Mr. Gonzales can get his screenings through Texas Health Center . . . . Mr. Gonzales would be responsible to pay.

The plan stated that "Gulf Bend Center will provide most of the case management and some counseling services for Mr. Gonzales, however he will also have access to services offered through his family home, including transportation, and monitoring of medications and [activities of daily life]."

## C. Dr. Phillip Balleza's Written Recommendations

Dr. Phillip Balleza is a psychiatrist at SASH in the forensic management unit. In a letter included with the evaluation report, Dr. Balleza wrote, "It is my professional opinion that Mr. Arnold Raul Gonzales is a low risk to the community provided he maintains medication compliance, attends his aftercare mental health clinic appointments, does not abuse drugs and remains under court supervision. Treatment can be safely and

6

effectively provided on an outpatient basis."

**D.    Cory Walleck's Testimony**

At the hearing on October 14, 2021, Cory Walleck testified that he is the adult services program manager for Gulf Bend Center. According to Walleck, Gulf Bend Center provides mental health services to individuals who are seeking treatment either voluntarily or who are court-ordered to receive treatment as a condition of their probation or parole. These services can include case management, counseling services, appointments with their staff psychiatrist, and medication administration, if requested by the patient. Walleck testified that, to his knowledge, Gulf Bend Center had never provided services to an individual found not guilty by reason of insanity and that he was not aware of any training available to help Gulf Bend Center comply with Chapter 46C. Although Gonzales had previously received outpatient treatment from Gulf Bend Center, Walleck was not directly familiar with Gonzales and had not examined his medical records.

Walleck had reviewed the treatment recommendations provided by SASH and testified that Gulf Bend Center could provide the services outlined in the recommendations, if ordered by the court to do so. However, Walleck also testified that Gulf Bend Center had not agreed to provide any services to Gonzales, and that they can refuse services to individuals if they feel providing those services may not be safe. Additionally, Walleck testified that Gulf Bend Center does not supervise individuals; instead, they merely provide mental health services on a voluntary basis. Even in cases involving court-compelled services, Gulf Bend Center does not ensure compliance with medication administration and cannot compel drug testing. Rather, a case manager from

7

Gulf Bend Center would report the non-compliance back to the parole or probation officer in charge of the individual. Walleck was not sure to whom he would report Gonzales's non-compliance, should that issue arise. When asked whether Gulf Bend Center was equipped to provide services to someone deemed not guilty by reason of insanity, Walleck responded, "I'm not really sure I would know that."

## E. Dr. Balleza's Testimony

According to Dr. Balleza, during Gonzales's initial trip to SASH, he was "extremely psychotic and very irritable." During his initial treatment of Gonzales, Dr. Balleza prescribed Gonzales an injectable medication called Invega Sustenna that is administered every twenty-eight days. Gonzales reportedly "responded very well to it."

Dr. Balleza concurred with Dr. Holder's findings in her dangerousness risk evaluation and stated that they were consistent with his clinical observations and professional opinion regarding Gonzales. Dr. Balleza testified that "[a]t a minimum [Gonzales] needs to be on his injectable, on his antipsychotic medication for the rest of his life, which can be supervised by the Court." Dr. Balleza did not recommend a direct supervision officer or another individual to supervise Gonzales's progress on a day-to-day or weekly basis, because Gonzales's monthly medicinal injection "would ensure that the mental health clinic would need to see him on a monthly basis. And if he missed that appointment, the day of his appointment you would know immediately that he was not complying with the Court's order."

## F. Dr. Holder's Testimony

Dr. Holder testified that Gonzales had displayed some exceptional characteristics

to justify her recommendation that he be released to an outpatient setting at such an early juncture. According to Dr. Holder, the level of supervision necessary for Gonzales to proceed on an outpatient basis would include "court-supervised commitment" which "involves intermittent regular hearings to ensure continued compliance, as well as connection with treatment providers. In the event that he were to become noncompliant . . . there [would be] a team approach."

## II.    FACTUAL SUFFICIENCY OF THE EVIDENCE

By a single issue, Gonzales argues the evidence was factually insufficient to support the trial court's amended inpatient commitment order.

## A.    Standard of Review

Commitment proceedings for persons found not guilty by reason of insanity are civil in nature. *Campbell v. State*, 85 S.W.3d 176, 180 (Tex. 2002). The burden of proof in commitment proceedings following a finding of not guilty by reason of insanity is heightened to a clear-and-convincing standard. *Truong v. State*, 574 S.W.3d 511, 519 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Under a heightened factual sufficiency review, we consider all the evidence, both in support of and contrary to the trial court's findings, and we give "due consideration to evidence that the factfinder reasonably could have found to be clear and convincing." *House v. State*, 261 S.W.3d 244, 247 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). The ultimate inquiry in a factual sufficiency review is whether a reasonable factfinder could have resolved disputed evidence in favor of the finding. *Id.* We must avoid supplanting our own judgment in place of the factfinder's. *Id.*

**B.** **Applicable Law**

Chapter 46C of the Texas Code of Criminal Procedure governs the raising of an insanity defense, the determination of a defendant's sanity, and the disposition of an acquitted person following a finding of not guilty by reason of insanity. *See* TEX. CODE CRIM. PROC. ANN. ch. 46C. When an acquitted person is found not guilty by reason of insanity, the trial court shall determine whether the charged offense included conduct that (1) caused serious bodily injury to another; (2) placed another in imminent danger of serious bodily injury; or (3) consisted of a threat of serious bodily injury to another through the use of a deadly weapon. *Id.* art. 46C.157.

In cases where the trial court makes a finding that the offense involved dangerous conduct, the court shall order an evaluation of the acquitted person's mental condition and that the defendant be committed to an appropriate inpatient facility for treatment. *Id.* art. 46C.251(a). The period of commitment is not to exceed thirty days. *Id.* At the conclusion of thirty days, the court is required to hold a hearing to determine the proper disposition of the defendant. *Id.* art. 46C.251(d). In other words, the court must determine whether inpatient or outpatient treatment is appropriate for the acquitted person. *See id.*

The trial court shall order commitment to an appropriate facility for inpatient treatment or residential care if the State establishes by clear and convincing evidence that: (1) the person has a severe mental illness or mental retardation; (2) the person, as a result of that mental illness or mental retardation, is likely to cause serious bodily injury to another if the person is not provided with treatment and supervision; and (3) inpatient treatment or residential care is necessary to protect the safety of others. *Id.* art.

46C.256(a). In determining whether the State has met its burden to show that inpatient treatment or residential care is necessary, the trial court shall consider whether "an adequate regimen of outpatient or community-based treatment will be available to the person" and whether "the person will follow that regimen." *Id.* art. 46C.256(b).

A court may only order an acquitted person to participate in outpatient treatment if "the court receives and approves an outpatient or community-based treatment plan that comprehensively provides for the outpatient or community-based treatment and supervision" and "the court finds that the outpatient or community-based treatment and supervision provided for by the plan will be available to and provided to the acquitted person." *Id.* art. 46C.263(b). In determining whether inpatient or outpatient treatment is the more appropriate option, "the court shall have as its primary concern the protection of society." *Id.* art. 46C.263(g).

## C.  Analysis

Here, it is undisputed that Gonzales has a severe mental illness and that as a result of that mental illness, he is likely to cause serious bodily injury to another if he is not provided with treatment and supervision. *See id.* art. 46C.256(a)(1-2). The only disputed element is whether the State has shown, by clear and convincing evidence, that "inpatient treatment or residential care is necessary to protect the safety of others." *See id.* art. 46C.256(a)(3).

The State argues that the trial court did not err in determining that the outpatient treatment plan proposed by SASH is not adequate. *See id.* art. 46C.263(b)(1). We agree. An outpatient treatment plan is required to "comprehensively provide[] for the outpatient

11

or community-based treatment and supervision." *Id.* art. 46C.263(b)(1). Indeed, it was Gonzales's counsel that, when referring to the treatment recommendations at the October 14 hearing, argued, "The outpatient plan is not comprehensive. It's not this detailed thing [Gulf Bend Center] can't provide."

The treatment recommendations for Gonzales included monthly appointments with a psychiatrist, intensive case management, individual therapy in the community on a weekly basis, and that he abstain from substance and alcohol use by attending weekly AA meetings "and/or" weekly counseling with a licensed chemical dependency counselor. The recommendations also listed two different levels of "intensive case management" services that Gulf Bend Center provides—but did not indicate in which of the two "intensive case management" options Gonzales would be required to participate. The treatment recommendations stated that "[a]ppointments will be scheduled immediately in the event of any crisis or if the team believes the treatment plan is not being adhered to," but made no mention of who would be responsible for scheduling these appointments and whether these appointments should be made with Gonzales's psychiatrist, his case manager, or some other individual. There was also no plan for the trial court or State to be notified in the event of Gonzales's non-compliance. *See id.* art. 46C.265(b).

The recommendations stated that Gulf Bend Center would "provide most of the case management and some counseling services for Mr. Gonzales," but it was not explicitly stated which case management and counseling services Gulf Bend Center would provide and which organization or individual would provide the remainder of the case management and counseling services recommended. Notably, Walleck testified that

12

Gulf Bend Center had not agreed to provide Gonzales with any services and had not assented to any other safe discharge plan. *See id.* art. 46C.264(b) ("This article does not supersede any requirement under the other provisions of this subchapter to obtain the consent of a treatment and supervision provider to administer the court-ordered outpatient or community-based treatment and supervision."); *see also In re Harris Ctr. for Mental Health & IDD*, No. 12-20-00228-CV, 2020 WL 6788715, at *5 (Tex. App.—Tyler Nov. 18 2020, no pet.) ("The trial court must obtain the facility's consent to provide its services.")

The report by SASH emphasized the need for Gonzales to abstain from substance abuse. The recommendations mentioned that Gulf Bend Center provided substance abuse counseling and a peer support group and that another organization, "Billy T. Cattan Recovery Outreach," offered "substance abuse support groups as well as individual counseling." However, there was no indication as to which option would be required of Gonzales.

Both Dr. Holder and Dr. Balleza stressed the importance of court supervision in their reports and in their testimony. While both doctors disavowed the necessity of daily or even weekly supervision of Gonzales, Dr. Holder recommended the court hold "intermittent regular hearings to ensure continued compliance" as part of the outpatient plan. There are several things a court may require when ordering an individual to participate in outpatient or community-based treatment and supervision, but requiring an acquitted person to attend "intermittent regular hearings to ensure continued compliance" is not contemplated by Chapter 46C. *See* TEX. CODE CRIM. PROC. ANN. art. 46C.263(c–e) (authorizing a court to order an acquitted person to "participate in a prescribed regimen

of medical, psychiatric, or psychological care or treatment" and to order supervision of the acquitted person through "the appropriate community supervision and corrections department or the facility administrator of a community center that provides mental health or mental retardation services" or through "the Texas Correctional Office on Offenders with Medical or Mental Impairments"). Rather, it is the duty of "[t]he person responsible for administering [the] regimen of outpatient or community-based treatment and supervision" to ensure treatment compliance, not the duty of the trial court. *See id.* art. 46C.265(a). Further, there is nothing in Chapter 46C to suggest a trial court is required to actively participate in an acquitted person's outpatient treatment plan. If the court credited Dr. Holder and Dr. Belleza's reports and testimony and found that court supervision was necessary for an adequate outpatient treatment regimen, the trial court could have reasonably concluded that this key component would not be available to Gonzales.

Walleck, for his part, testified that Gulf Bend Center had not agreed to provide Gonzales with any services, did not supervise their clients, and that he was unsure to whom he would report any potential non-compliance. Walleck did testify that Gulf Bend Center had the ability to provide the services listed in the treatment recommendations, if ordered to do so. However, the treatment recommendations did not make clear what specific services the trial court would have ordered Gulf Bend Center to provide. Additionally, Walleck was ultimately unsure whether Gulf Bend Center was equipped to provide sufficient services to someone found not guilty by reason of insanity. Although somewhat contradictory, the trial court as factfinder was permitted to resolve Walleck's testimony in favor of a finding that Gulf Bend Center would not be able to provide

14

adequate outpatient treatment services to Gonzales. *See Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986) ("The [factfinder] may . . . accept portions of the testimony of a witness and reject other portions.").

Thus, based on this record, the trial court could have resolved the disputed evidence in favor of a finding that there would not be an adequate regimen of outpatient or community-based treatment available for Gonzales, and therefore, inpatient treatment or residential care would be necessary to protect the safety of others. *See id.* arts. 46C.256(a)(3), 46C.256(b)(1). We hold that factually sufficient evidence supports the trial court's amended order committing Gonzales to inpatient care.

We overrule Gonzales's sole issue.

### III.    CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Delivered and filed on the
10th day of February, 2022.

15